# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION

SUNENERGY1, LLC,

                Plaintiff,

v.

ASHLEY MORGAN,

                Defendant.

Civil Action No.   5:21-cv-133

**COMPLAINT**

Plaintiff SunEnergy1, LLC ("SunEnergy1", the "Company", or "Plaintiff"), complaining of Defendant Ashley Morgan ("Defendant Morgan"), alleges and states as follows:

## INTRODUCTION

1.     Defendant Morgan is a con artist who devised and executed a devious plan to steal confidential and proprietary information and trade secrets from her former employer, SunEnergy1. Within days after Defendant Morgan began employment with SunEnergy1 in Mooresville, North Carolina, Defendant Morgan's family members established competing entities overnight in their home state of Utah. To benefit her family's companies, Defendant Morgan exploited her position as executive assistant to SunEnergy1's Chief Executive Officer ("CEO") to gain access to SunEnergy1's confidential and proprietary information and trade secrets during her employment. Hours after she resigned her position at the Company, Defendant Morgan, without authorization, accessed Company files and stole SunEnergy1 confidential and proprietary information and trade secrets. Defendant Morgan's theft of SunEnergy1's confidential and proprietary information and trade secrets violated her Employment and Confidentiality Agreement (Exhibit 1 attached hereto,

hereinafter, the "Confidentiality Agreement") in which Defendant Morgan contracted to safeguard the Company's information and acknowledged that any breach entitles SunEnergy1 to preliminary and permanent injunctive relief and other damages including monetary relief. Defendant Morgan's misappropriation also violates North Carolina statutory and common law protections against theft of trade secrets and confidential information as well as the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq* ("DTSA"), the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, which all entitle SunEnergy1 to recover attorneys' fees. Defendant Morgan's misappropriation also constitutes unlawful competition that entitles SunEnergy1 to preliminary and permanent injunctive relief and other damages including monetary relief.

2. Defendant Morgan's Confidentiality Agreement required her to return all SunEnergy1 property to the Company upon her separation. In addition, upon Defendant Morgan's resignation, SunEnergy1 expressly instructed Defendant Morgan to immediately return all Company devices and equipment that she was no longer authorized or permitted to access. In direct defiance of SunEnergy1's specific instructions and in violation of her contractual confidentiality and non-disclosure obligations to SunEnergy1, Defendant Morgan surreptitiously and unlawfully accessed the Company laptop computer issued to her to use her SunEnergy1 email account and download targeted files containing SunEnergy1's confidential information and trade secrets to a USB thumb drive in her possession that she connected to the laptop, all in an effort to steal confidential files.

3. Defendant Morgan's intentional theft further violates the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat.§ 66-152 *et seq.*, which entitles SunEnergy1 to attorneys' fees and punitive damages in addition to injunctive relief.

2

4.      Defendant Morgan's theft is a cybercrime under N.C. Gen. Stat. § 14-458, which is punishable in civil remedies, including the costs of this lawsuit.

5.      Defendant Morgan's actions also constitute unlawful and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1.

6.      Defendant Morgan's intentional, unauthorized and illegal access of SunEnergy1's electronic systems constitutes a violation of the Stored Communications Act, 18 U.S.C. § 2701 *et seq*. and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

7.      Given the evidence of Defendant Morgan's wrongdoing, including and without limitation, the theft of confidential SunEnergy1 information, SunEnergy1 will continue to be harmed without protection from this Court.  Accordingly, SunEnergy1 brings this action to redress Defendant Morgan's unlawful conduct.

## PARTIES, JURISDICTION & VENUE

8.      SunEnergy1, LLC is a North Carolina limited liability company with its primary place of business located at 192 Raceway Drive, Mooresville, North Carolina 28117.

9.      Defendant Morgan is an individual who, upon information and belief, currently resides at 1638 N Geneva Road, Provo, Utah 84601, but lived in North Carolina while she was employed with SunEnergy1.  Additionally, during the first few months of her employment with SunEnergy1 and the last several months of her employment with SunEnergy1, she resided in an apartment located in the SunEnergy1 corporate headquarters at 192 Raceway Drive, Mooresville, North Carolina 28117.  Defendant Morgan consented to the jurisdiction of this Court in Section 10 of her Confidentiality Agreement.

10.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff has claims for misappropriation of trade secrets under the DTSA, 18

3

U.S.C. § 1836(c), the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

11.     This Court has pendent or supplemental jurisdiction over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to Plaintiff's claims occurred in this district as Defendant Morgan was employed by SunEnergy1 and living in Mooresville, North Carolina.

## FACTS

13.     SunEnergy1 is a leading solar developer in the United States, building and operating record-breaking solar projects.

14.     On or about November 18, 2019, Defendant Morgan began employment with SunEnergy1 as an executive assistant to the CEO in its Mooresville headquarters. For her work at the Company, SunEnergy1 provided Defendant Morgan with an annualized salary of $70,000 and benefits, including corporate housing.

15.     As a condition of her employment with SunEnergy1, Defendant Morgan entered into the Confidentiality Agreement with the Company. The Confidentiality Agreement contains provisions prohibiting Defendant Morgan from: (A) moonlighting with other companies during her time at the Company; (B) having an undisclosed relationship with a family member or other individual who is a competitor of SunEnergy1; and (C) using her position and access to Company confidential information for personal gain. The Confidentiality Agreement also contains, among other provisions, confidentiality obligations and limitations on Defendant Morgan's access to SunEnergy1's information systems. A true and accurate copy of the Confidentiality Agreement is attached hereto as Exhibit 1.

4

16.     Section 1 of the Confidentiality Agreement, in relevant part, states as follows:

*Employment*.  [. . . .] Employee shall devote Employee's full time, attention, energy, knowledge, skill and best efforts solely and exclusively to the duties assigned to Employee which employee shall faithfully and diligently perform.  Employee shall report to the Company as may be required.  Employee will fully account for all records, data, materials, or other property belonging to the Company or its customers of which Employee has possession or control.  Employee agrees to observe faithfully any and all rules, regulations, policies or directives as the Company, from time to time, may establish.

(Exhibit 1 – Confidentiality Agreement, ¶ 1.)

17.     Section 6 of the Confidentiality Agreement, states as follows:

*Duty of Loyalty and Business Opportunity*.  Employee shall serve the Company as a loyal employee and fiduciary, devote Employee's best efforts, energy and skill to the discharge of Employee's duties and perform all the duties and obligations required of Employee by this Agreement in a loyal and conscientious manner.  During the term of this Agreement, Employee may acquire knowledge of either (a) information that is relevant to the business of the Company or (b) knowledge of business opportunities pertaining to the business in which the Company is engaged.  Employee shall promptly disclose to the Company such information or business opportunities and agrees not to disclose such information to third parties without the express written consent of the Company.  Employee agrees not to enter into any agreements to provide programming, consulting, technical writing or other services to any company, person, or other organization not affiliated with the Company without the express written consent of the Company.  Should Employee develop any manuals, software, processes or other business opportunities during the course of the employment, which is not property of the Company, Employee agrees that the Company shall have the right of first refusal to publish and/or purchase the rights to such matters.  Employee shall notify the Company as soon as possible during the development process of the existence of such manuals, software, processes or other business opportunities regarding the existence of such activity and the nature of same, and any other information necessary to enable the Company to make a decision whether to acquire said products.

Employee further agrees not to have an undisclosed financial interest in any competitor, customer, or supplier of the Company, accepting payments of any kind from any competitor of the Company or payments of any kind or gifts other than of a nominal value from any customer, or supplier of the Company, or having an undisclosed relationship with a family member or other individual who is employed by any competitor, customer or supplier of the Company and which creates a conflict of interest.  Employee acknowledges that Employee may not use Employee's position, influence, knowledge of confidential information or the

5

Company's assets for personal gain except as specifically provided for in this Agreement.

(Exhibit 1 – Confidentiality Agreement, ¶ 6.)

18.     Section 2 of the Confidentiality Agreement, in pertinent part, states as follows:

_Confidentiality_.    The Employee acknowledges that during the Employee's employment with the Company the Employee will acquire, be exposed to and have access to, material, data and information of the Company and/or its customers or clients that is confidential, proprietary, and/or a trade secret.    At all times, both during and after the termination of employment, the Employee shall keep and retain in confidence and shall not disclose, except as required in the course of the Employee's employment with the Company, to any person, firm, corporation or business entity, or use for her own purposes, as of this proprietary, confidential or trade secret information. . . . The Employee acknowledges that the obligations pertaining to the confidentiality and non-disclosure of information shall remain in effect until the Company has released any such information into the public domain, in which case the Employee's obligation hereunder shall cease with respect only to such information so released.

(Exhibit 1 – Confidentiality Agreement, ¶ 2.)

19.     Section 5 of the Confidentiality Agreement further states as follows:

_Authorization to Access Company Computers_.    Employee understands that while employed with the Company, Employee will use and have access to the Company's Information Systems owned by, leased to or otherwise operated by the Company that consist of hardware, including but not limited to, computers, servers, personal digital assistants, phones, networks, routers, accessories, computer networks and electronically stored information; and the software supporting the hardware, including but not limited to, operating systems, databases, and applications such as email and services.    Employee agrees that Employee is authorized to access Company Information Systems only for approved business purposes and occasional personal use if such use does not interfere with Employee's work responsibilities and other required business activities, business operations, or system performance. However, **_Employee acknowledges that Employee is not authorized to use the Company's Information Systems for personal gain or any illegal or unethical use.  Employee agrees that under no circumstances is Employee authorized to access any of the Company's Information Systems for the purpose of obtaining the Company's confidential information for a competitor of the Company, emailing confidential information to access any of the Company's Information Systems for the purpose of obtaining the Company's confidential information for a competitor of the Company, and downloading Company confidential_**

*information to removable media such as a CD Rom, disk or thumb drive other than as authorized for furthering the business objectives of the Company*. . . .

(Exhibit 1 - Confidentiality Agreement, ¶ 5.) (emphasis added).

20.     Section 3 of the Confidentiality Agreement also provides:

*Return of Company Property.* Upon termination from the Company, Employee shall promptly deliver to the Company all property of the Company, including, but not limited to, vehicles, phones, computers and other equipment and electronic devices, manuals, letters, notes, files, notebooks, reports, employee lists, customer lists and contact information, mailing lists, contracts, invoices, keys, and all other materials or documents of the Company or the Company's customers, including any and all copies and any and all information retained on computer diskette, CD, software, or hard drive.

With respect to computers, phones and other equipment or electronic devices, Employee shall return such property without deleting or wiping data relating in any way to the Company. Employee agrees to return to the Company immediately upon termination all such electronically stored information contained in any computer, phone or other electronic device.

(Exhibit 1 - Confidentiality Agreement, ¶ 3.)

21.     Additionally, the Confidentiality Agreement provides for injunctive relief among other remedies in the event of a breach. Specifically, the Confidentiality Agreement states:

*Company's Right to Obtain an Injunction*. The Employee acknowledges that the Company will have no adequate means of protecting its rights under Paragraphs 2, 3, 4, and 5 of this Agreement other than by securing an injunction (a court order prohibiting the Employee from violating the Agreement). Accordingly, the Employee agrees that the Company is entitled to enforce this Agreement by obtaining a preliminary and permanent injunction and any other appropriate equitable relief. Nothing contained in this paragraph, however, shall prohibit the Company from pursuing any remedies in addition to injunctive relief, including recovery of damages.

(Exhibit 1 – Confidentiality Agreement, ¶ 8.)

22.     In connection with her employment, SunEnergy1 issued Defendant Morgan a Company laptop and email address subject to the Company's confidentiality and information systems policies.

7

23.     During her employment, Defendant Morgan had access to SunEnergy1's confidential information and trade secrets stored on the Company's electronic communications systems.

24.     Defendant Morgan's job duties as an executive assistant involved accessing certain confidential information and trade secrets to perform administrative tasks for the CEO, such as to forward a document containing such confidential information and trade secrets. However, she was not an executive or managerial employee who regularly used such confidential files to perform her own analysis, generate information and reports, or to transact business because those responsibilities were not part of her job.

25.     Defendant Morgan recruited and planted her aunt, Tamara Morgan, at the rate of six thousand dollars per month starting on June 24, 2020, to work with Defendant Morgan in the SunEnergy1 office located in Mooresville, North Carolina, where Tamara Morgan lived with Defendant Morgan for approximately two months. On June 22, 2020, prior to commencing work for SunEnergy1, Tamara Morgan executed a Confidentiality Agreement, in which she agreed, among other undertakings, to: (1) safeguard the Company's confidential information and trade secrets; (2) return all Company property upon termination of the contractor relationship; (3) only use the Company's computer systems for authorized SunEnergy1 business; and (4) perform her duties in a loyal manner, including disclosing potential conflicts of interest to the Company.

26.     Upon information and belief, Tamara Morgan and Defendant Morgan shared the same residence in Provo, Utah before each of them moved to North Carolina and resided in SunEnergy1's corporate offices.

27.     Defendant Morgan presented Tamara Morgan to SunEnergy1 as an acclaimed authority on automobile fleet management and asset control and on that basis, the Company hired Tamara Morgan as an independent contractor.

28.     During the time that Tamara Morgan worked at SunEnergy1, she did not produce any work product or perform any verifiable services. Rather, Tamara Morgan spent her time at the Company conspiring with Defendant Morgan to covertly learn about SunEnergy1's business, obtain access to corporate confidential files and trade secrets and assist Defendant Morgan in her theft of corporate assets and opportunities.

29.     In or about late August 2020 Tamara Morgan abruptly quit, and her last day of work for SunEnergy1 was August 27, 2020.

30.     On or about September 10, 2020, Defendant Morgan traveled to Utah purportedly to attend the funeral of a relative. Several days later, Defendant Morgan returned to Mooresville, North Carolina and resumed working.

31.     Defendant Morgan stopped performing work for SunEnergy1 prior to October 4, 2020, at which point in time she was not authorized to use any SunEnergy1 equipment and no longer engaged to perform any work for SunEnergy1.

32.     On or about October 23, 2020 at 11:29 am, Defendant Morgan notified SunEnergy1 that she resigned immediately from employment with the Company.

33.     In response to her resignation, SunEnergy1 immediately instructed Defendant Morgan that she must return all Company equipment and information, including her laptop, smart phone, and Company files. SunEnergy1 further advised Defendant Morgan she was not authorized to keep any Company equipment or files.

9

34.     Later during the night of October 23, 2020 (at 7:02 pm and 8:42 pm) and after SunEnergy1 instructed Defendant Morgan to return all Company equipment and information, which she was not authorized to access, Defendant Morgan disregarded SunEnergy1's orders. Specifically, Defendant Morgan accessed her Company laptop, connected to her SunEnergy1 Outlook account, and downloaded 23 strategically-selected Company files and/or files relating to the personal assets of SunEnergy1's CEO to a USB flash drive.

35.     The next day, Defendant Morgan again accessed her Company laptop, cherrypicked and downloaded eight additional files to the USB flash drive, several of which included electronic files related to the CEO's personal assets, net worth and codes to security systems to his residences, as well as other files containing personal information related to his family members, such as his children's passport numbers, for which Defendant Morgan had no legitimate reason to access or take into her possession.

36.     When accessing and downloading SunEnergy1's confidential information and trade secrets, Defendant Morgan undertook deliberate, precautionary measures to avoid detection and conceal her digital footprint. For example, rather than downloading files directly from SunEnergy1's servers, Defendant Morgan copied files from emails to which they were attached without saving them locally on the laptop computer. In addition, Defendant Morgan downloaded these files when she was disconnected from her Company Microsoft Outlook account at the time of the download, meaning that she logged out of her Outlook account in order to minimize the digital trail of her downloads. Morgan also deleted certain files from her Company computer to cover up her tracks.

37.     On or about December 31, 2020, Defendant Morgan filed a charge with the Equal Employment Opportunity Commission in North Carolina against SunEnergy1, including

allegations of harassment, retaliation, and constructive discharge, apparently in an attempt to distract from and mask her unlawful activity.

**I.      Defendant Morgan took SunEnergy1's confidential and proprietary information and trade secrets.**

38.      Specifically, during her surreptitious electronic raid on SunEnergy1's property, Defendant Morgan downloaded files including the following:

      a.  Compilations of all SunEnergy1 current and potential job sites;

      b.  Maximum probable loss studies;

      c.  Detailed information on SunEnergy1's tax credits and deductions:

      d.  An inventory of all SunEnergy1 vehicles and their values; and

      e.  Information related to SunEnergy1's application for a loan under the Payroll Protection Program ("PPP"), including, without limitation, a list of SunEnergy1's employees and their compensation information.

**A.      SunEnergy1's current and potential job sites**

39.      SunEnergy1's current and potential job sites are one of SunEnergy1's most valuable trade secrets.

40.      SunEnergy1 spends significant time and resources researching and bidding on project sites.  The research, planning and application process can easily take at least six years before the Company receives a permit to begin site construction.

41.      Before SunEnergy1 can submit an application for a permit to construct a project, it must thoroughly research and determine the optimal site location for a project. The research includes locating counties that allow solar development and have ordinances that provide for solar development.  Additionally, because transmission lines are unable to receive an unlimited amount of solar energy, SunEnergy1 must evaluate which "solar-friendly" counties are not already over-saturated with solar developments.

11

42.     SunEnergy1 must also consider the location of an interconnection point to a transmission line. In order to capture and use the solar energy generated from the prospective project, the project must attach to a transmission line that carries the energy to the electric grid. The point at which the project connects with the transmission line is called the interconnection point.

43.     Once a developer has identified a prospective site location and secured the land rights for at least three years, they can then begin the formal permit application process, which can take between three and five years, or longer, and includes three phases.  A developer submits an application to the appropriate regional transmission organization ("RTO")[1], thereby securing their place in what is known in the industry as the "queue."  A solar developer's position in the queue is directly tied to the date of their application.  Solar developers submit their applications on a "first come, first served" basis, which means the RTO evaluates the applications on that priority order.  Each queue is open for developers to submit applications for six-months, at which point the queue closes and the RTO begins to evaluate the pending applications.

44.     SunEnergy1's success in the solar industry is due, in large part, to the processes and procedures it has developed for identifying prospective project sites through a painstaking, methodical process of trial and error over the course of more than a decade.  If a competitor were to obtain a list of SunEnergy1's project sites or prospective project sites, it would be invaluable, as it would enable the competitor to effectively skip the immensely expensive research phase of solar project development and cut right to submitting an application.  Additionally, if a competitor

_____

[1] RTOs coordinate and manage electric grids across areas of the country spanning multiple states.

12

were to pursue a SunEnergy1 project location, the competitor would be able to undercut SunEnergy1's position in the queue and submit an application before SunEnergy1.

45.     Given the limited capacity of a transmission line and the scarcity of available land, if a competitor pursued a project at one of SunEnergy1's prospective sites, it would not be economically feasible, and potentially impossible, for SunEnergy1 to move forward with the project. SunEnergy1 would incur monetary damages associated with the costs of the research and evaluation of the prospective project site, which could exceed $1 million. Additionally, SunEnergy1 would lose the future revenue associated with the project, exceeding tens of millions of dollars.

46.     SunEnergy1's project locations, both current and prospective, are invaluable for competitors, as obtaining this information would save them millions of dollars, years of time, and allow them to instantly compete with the most successful companies in the solar industry.

**B.      SunEnergy1's Maximum Probable Loss Studies**

47.     On or about October 23 and 24, 2020, Defendant Morgan downloaded SunEnergy1's maximum probable loss studies.

48.     In connection with financing for each solar site, SunEnergy1 must obtain the proper insurance policy. In order to determine the adequate amount of insurance required, the insurance company conducts a maximum probable loss study on SunEnergy1. This study contains information on all aspects of SunEnergy1's business. Specifically, it includes the cost of building the project site down to how much SunEnergy1 pays for solar panels and labor. The maximum probable loss study also includes the length of time SunEnergy1 takes to build the project.

49.     The information contained in the maximum probable loss study provides a competitor with all the information necessary to compete with SunEnergy1 in the solar industry.

13

The study provides a detailed roadmap on what a competitor would need, and how much they could afford to pay, for each aspect of a solar project.

50.     SunEnergy1 keeps this information confidential and has invested years and millions of dollars in perfecting its business model.

### C.     Confidential Company Employee Information

51.     On or about October 23 and 24, 2020, Defendant Morgan also downloaded information related to SunEnergy1's application for a loan under the PPP, including a roster of Company employees with their compensation information.

52.     SunEnergy1's employee and compensation data represent confidential and valuable information concerning the Company's core asset, its personnel.  The Company has spent millions of dollars in assembling and training a cohesive team to develop an industry-leading solar company.  This information would provide a new market entrant or a SunEnergy1 competitor with all the personnel information it needed to build its own team of solar professionals.   This information would also be invaluable to a competitor looking to poach SunEnergy1 employees.

## II.     Defendant Morgan intends to use SunEnergy1's confidential information and trade secrets to help her family's competing businesses.

53.     Defendant Morgan surreptitiously accessed and downloaded SunEnergy1's confidential information and trade secrets for her own personal gain and, upon information and belief, for the benefit of AC/DC Energy, LLC ("AC/DC Energy") and MADE Solar LLC, ("MADE Solar") competing entities started by Defendant Morgan's family shortly after she commenced employment with SunEnergy1.

54.     Within days after Defendant Morgan began employment with SunEnergy1, her family entered the solar construction industry with their newly invented companies MADE Solar and AC/DC Energy.  In contravention of the requirements of her Confidentiality Agreement,

Defendant Morgan did not disclose the existence of her family's newly-created solar businesses at any time during her employment with the Company.

55.     Upon information and belief, Defendant Morgan is using or planning to share SunEnergy1's confidential information and trade secrets with AC/DC Energy and MADE Solar.

**A.     Made Solar, LLC**

56.     MADE Solar is a Utah limited liability company established on November 26, 2019.

57.     MADE Solar was incorporated on November 26, 2019 by Tailor Brooks Gibbons in the State of Utah. (Exhibit 2 – Certificate of Organization.)

58.     Upon information and belief, Defendant Morgan's brother-in-law, Tailor Brooks Gibbons, is a founding member of MADE Solar.

59.     The Certificate of Organization for MADE Solar was filed with the State of Utah one week after Defendant Morgan began employment with SunEnergy1.

60.     On February 23, 2020, MADE Solar published on its website http://www.made-solar.com/ and on its Facebook page that it had performed a solar installation on an IKEA facility in Queensland, Australia despite the fact that, upon information and belief, MADE Solar neither performed the specific IKEA project in question nor any other projects for IKEA.

61.     MADE Solar maintains a website and publishes the following on its "about" page: "The Full Service Solar Company We handle everything from start to finish and outsource nothing. The switch to solar takes a full team. Our in-house experienced teams are with you every step of the way." Upon information and belief, MADE Solar published these statements knowing they are false and in an attempt to cast itself as a company comparable of comparable size and ability as SunEnergy1.

15

62.     Images of solar panels that appear on the website http://www.made-solar.com/ for a roof-mounted, commercial solar installation are labeled "968 Hanwha Q Cells: Q.Peak Duo L-G5.2 390 panels" and "150 Hanwha Q Cells: Q.Peak Duo L-G5.2 390 panels". (Exhibit 3 – website images.)

63.     SunEnergy1 uses the same brand and model of solar panels for utility scale *ground mount* installations. The panels depicted on MADE Solar's website are inappropriate for roof-mounted installation.

64.     The MADE Solar website displays the same brand and model panels as those used by SunEnergy1, but the MADE Solar website images falsely and mistakenly display a panel specifically designed for ground scale mount on a roof top further evidencing a fraud and theft by Defendant Morgan.

65.     Upon information and belief, Defendant Morgan's brother-in-law's company website would not have displayed the same panels used by SunEnergy1 but for Defendant Morgan's knowledge from her employment with SunEnergy1, despite the mistaken presentation on the MADE Solar website.

**B.     AC/DC Energy, LLC**

66.     AC/DC Energy, LLC is a Utah limited liability company established on February 10, 2020. Defendant Morgan's father, William Morgan, is the sole member of AC/DC Energy, LLC.

67.     AC/DC Energy, LLC was incorporated on February 10, 2020 by William Morgan in the State of Utah. (Exhibit 4 – Certificate of Organization.)

68.     The Certificate of Organization for AC/DC Energy, LLC was filed less than three months after Defendant Morgan began employment with SunEnergy1.

69.     AC/DC Energy, LLC maintains a website at http://www.acdcsolarenergy.com/.

16

70.     The website http://www.acdcsolarenergy.com/ is virtually identical to the http://www.made-solar.com/. (Exhibit 5 – MADE Solar Website; Exhibit 6 – AC/DC Energy Website.)  Indeed, the source code for the two websites is nearly identical.  (Exhibit 7 – Source Code from MADE Solar Website; Exhibit 8 – Source Code from AC/DC Energy Website.)

71.     The same images of the solar panel brand and model used in the MADE Solar website and used by SunEnergy1 in utility scale ground mount solar installations appear on the AC/DC Energy website in an image of a commercial rooftop solar installation.

72.     The MADE Solar website displays the same mistake as the AC/DC Energy website, further showing a concerted effort among Defendant Morgan, her father and her brother-in-law to profit from Defendant Morgan's employment with SunEnergy1 and knowledge of its development projects.

73.     Upon information and belief, both the MADE Solar and AC/DC Energy websites advertise that MADE Solar and AC/DC Energy have performed solar installation work for a variety of large companies, including Home Depot, IKEA, Target, Johnson & Johnson, Kohl's, Macy's, Staples, Walgreens, Walmart, and Big O Tires.  Upon information and belief, neither MADE Solar nor AC/DC Energy has performed work for any of these companies and the information on the MADE Solar and AC/DC Energy websites is false, misleading, and deceptive to the public.

74.     Further, and compounding the deception, SunEnergy1 has pursued business relationships with some of the large corporations listed on the MADE Solar and AC/DC Energy websites.  Upon information and belief, Defendant Morgan shared this information with her father and brother-in-law in an attempt to add a false veneer of credibility to their fledgling businesses.

**C.     Defendant Morgan's employment background and moonlighting with Morgan Auto.**

75.     Upon information and belief, prior to her employment with SunEnergy1, Defendant Morgan had no employment experience in the solar industry in which SunEnergy1 conducts business.

76.     Instead, Defendant Morgan held various jobs including an actress, flight attendant, marijuana farmer, "Event Manager/Brand Ambassador/Promotional Model", and a used car salesperson.  Tellingly, Defendant Morgan did not include her acting experience on her resume when she applied to work for SunEnergy1 as an executive assistant.

77.     According to Defendant Morgan's resume, she last worked for  Morgan Auto LLC, a used car lot in Provo, Utah, owned and operated by William Morgan, her father, before she worked for SunEnergy1.

78.     Upon information and belief, Defendant Morgan continued to work for her father and Morgan Auto LLC while she was employed by SunEnergy1.  On April 15, 2020, Defendant Morgan, received a PPP loan in the amount of $11,400 from Mountain America Credit Union, purportedly for her work for as an independent contractor for a used car dealer in Provo, Utah— the same type of business in the same location as Morgan Auto LLC.  At this same time (April 2020), Defendant Morgan was working for the Company full-time and receiving a salary.  Upon information and belief, Defendant Morgan performed work for Morgan Auto LLC while employed by the Company in direct contravention of Sections 1 and 6 of her Confidentiality Agreement and without authority from SunEnergy1 management.

79.     Upon information and belief, Defendant Morgan worked inside SunEnergy1 to gain access to and steal confidential information and trade secrets, including highly valuable documents, all in an effort to enable her family members' newly created solar companies to skip the costly research and development process and enter the solar development and distribution

18

industry overnight, thereby wreaking havoc on SunEnergy1's business and sapping its lifeblood, which includes the innerworkings of the Company, its customer projects and strategic documents and confidential information and trade secrets. As an added benefit, should Defendant Morgan's family members prove to be unsuccessful in developing their own solar development businesses despite their ill-gotten advantages, the confidential information and trade secrets stolen by Defendant Morgan remain valuable, as Defendant Morgan could sell them to competitors for a handsome profit.

80.     Upon information and belief, Defendant Morgan is already sharing SunEnergy1's confidential information and trade secrets to benefit her family members and their newly created companies. For example, on February 20, 2021, William Morgan, Defendant Morgan's father, received a PPP loan in the amount of $20,000 from Mountain America Credit Union, purportedly for "Solar Electric Power Generation" in Provo, Utah. Upon information and belief, William Morgan utilized the materials related to SunEnergy1's PPP loan application, which were stolen by Defendant Morgan, to aid in his own application for a PPP loan for his fledgling solar business.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Defend Trade Secrets Act — 18 U.S.C. § 1836, et seq.)**

81.     Plaintiff realleges and incorporates by reference all prior paragraphs in this Complaint and paragraphs in the claims below as though set forth fully herein.

82.     Defendant Morgan acquired Plaintiff's trade secret information during the course of her employment with SunEnergy1.

83.     The confidential information and trade secrets belonging to SunEnergy1 that were acquired by Defendant Morgan during the course of her employment include:

    a.   Compilations of all SunEnergy1 current and potential job sites;

19

b. Maximum probable loss studies;

c. Detailed information on SunEnergy1's tax credits and deductions;

d. An inventory of all SunEnergy1 vehicles and their values; and

e. Information related to SunEnergy1's application for a loan under the PPP, including, without limitation, a list of SunEnergy1's employees and their compensation information.

84. This information constitutes trade secrets under the DTSA, 18 U.S.C. § 1836, *et seq.*

85. By virtue of her employment with SunEnergy1 and her obligations pursuant to her Confidentiality Agreement, Defendant Morgan owed a duty to SunEnergy1 not to use, disclose, or otherwise misappropriate the Company's trade secrets.

86. After terminating her employment with the Company, Defendant Morgan misappropriated the following trade secrets from SunEnergy1:

a. Compilations of all SunEnergy1 current and potential job sites;

b. Maximum probable loss studies;

c. Detailed information on SunEnergy1's tax credits and deductions:

d. An inventory of all SunEnergy1 vehicles and their values; and

e. Information related to SunEnergy1's application for a loan under the PPP, including, without limitation, a list of SunEnergy1's employees and their compensation information.

87. Upon information and belief, Defendant Morgan profited and will continue to profit and be unjustly enriched from the aforesaid misappropriation.

88. By virtue of her conduct as alleged herein, Defendant Morgan intentionally and knowingly competed unfairly against SunEnergy1 by diverting SunEnergy1's trade secrets to herself for use in direct competition with the Company and in disregard of Plaintiff's rights.

20

89. Defendant Morgan's actions constitute intentional, willful and malicious misappropriation of SunEnergy1's trade secrets as those terms are used in 18 U.S.C. § 1832.

90. As a consequence of the foregoing, SunEnergy1 has suffered, and will continue to suffer, harm and loss, some of which is irreparable for which there is no adequate remedy at law.

**SECOND CAUSE OF ACTION**
**(Stored Communications Act - 18 U.S.C. § 2701 *et seq.*)**

91. Plaintiff realleges and incorporates by reference all prior paragraphs in this Complaint and paragraphs in the claims below as though set forth fully herein.

92. This is an action for damages and injunctive relief under the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*

93. SunEnergy1 provides each of its employees an email address and access to email facilities that are stored on servers owned and maintained by SunEnergy1.

94. SunEnergy1's email system constitutes "a facility through which an electronic communication service is provided" within the meaning of the Stored Communications Act.

95. Defendant Morgan intentionally accessed her SunEnergy1 email account after her resignation from SunEnergy1.

96. Defendant Morgan did not have authorization to access her SunEnergy1 email account after her resignation.

97. As a result of Defendant Morgan's unauthorized access to her SunEnergy1 email account, Defendant Morgan obtained, altered, or prevented authorized access to one or more email communications that were in storage on SunEnergy1's system at the time of her unauthorized access.

98. SunEnergy1 has been damaged as a result of Defendant Morgan's unauthorized access to its systems, including incurring attorneys' fees in bringing this claim.

21

## THIRD CAUSE OF ACTION
### (Computer Fraud and Abuse Act - 18 U.S.C. § 1030)

99. Plaintiff realleges and incorporates by reference all prior paragraphs in this Complaint and paragraphs in the claims below as though set forth fully herein.

100. This is an action for damages and injunctive relief under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.

101. SunEnergy1 provides each of its employees with access to a computer and computer network for purposes of fulfilling the employee's duties to SunEnergy1.

102. Defendant Morgan's Confidentiality Agreement directs that all computers issued to her in the course of her employment with SunEnergy1 must be returned upon her departure from the Company.

103. The Confidentiality Agreement further requires that any Company-issued computer be returned in the condition in which it was maintained by Defendant Morgan during her employment.

104. No former employee is authorized to access or alter any SunEnergy1 computer or any information contained on a SunEnergy1 computer after departing the Company's employment.

105. Defendant Morgan intentionally accessed her SunEnergy1-issued computer after her employment with SunEnergy1 ended.

106. Defendant Morgan did not have authorization to access the SunEnergy1-issued computer.

107. As a result of this unauthorized access, Defendant Morgan obtained a substantial amount of information from SunEnergy1.

22

108.     SunEnergy1 has been damaged in excess of $5,000.00 as a result of Defendant Morgan's unauthorized access to its computer, and has incurred attorneys' fees in bringing this claim.

## FOURTH CAUSE OF ACTION
### (Breach of Contract)

109.     Plaintiff realleges and incorporates by reference all prior paragraphs in this Complaint and paragraphs in the claims below as though set forth fully herein.

110.     Plaintiff has substantial rights existing under its contractual agreements with Defendant Morgan.

111.     Plaintiff has fully performed all of its obligations to Defendant Morgan pursuant to these agreements.

112.     Despite SunEnergy1's good faith performance, Defendant Morgan breached her contractual obligations including Sections 1, 2, 3, 5, and 6 of her Confidentiality Agreement by, among other things: (A) continuing to work for her father and Morgan Auto LLC while she was employed by the Company; (B) failing to disclose her family's interests in solar industry companies; (C) accessing, downloading, disclosing, and misappropriating the Company's trade secrets and confidential information; and (D) using SunEnergy1's confidential information and trade secrets for her own personal gain and that of her family.

113.     As a result of Defendant Morgan's breaches, SunEnergy1 has suffered actual damages.

114.     As a consequence of the foregoing, Plaintiff has suffered, and will continue to suffer, harm and loss, some of which is irreparable for which there is no adequate remedy at law.

23

115. Plaintiff is entitled to judgment against Defendant Morgan for the full amount of its actual, general, compensatory, incidental, special, and consequential damages relating to her contractual breaches.

## FIFTH CAUSE OF ACTION
### (Violation of the NCTSPA - N.C. Gen. Stat.§ 66-152 *et seq.*)

116. Plaintiff realleges and incorporates by reference all prior paragraphs in this Complaint and paragraphs in the claims below as though set forth fully herein.

117. During her employment with SunEnergy1, Defendant Morgan had access to SunEnergy1's confidential and proprietary business information as described above, which information is exclusive to SunEnergy1 and not generally known in the industry.

118. Specifically, Defendant Morgan had access to the following:

a. Compilations of all SunEnergy1 current and potential job sites;

b. Maximum probable loss studies;

c. Detailed information on SunEnergy1's tax credits and deductions;

d. An inventory of all SunEnergy1 vehicles and their value; and

e. Information related to SunEnergy1's application for a loan under the PPP, including, without limitation, a list of SunEnergy1's employees and their compensation information.

119. The confidential information accessible to Defendant Morgan was of independent commercial value.

120. The confidential information accessible to Defendant Morgan was not generally known or readily ascertainable to others.

121. The confidential information belonging to SunEnergy1 is considered trade secrets under N.C. Gen. Stat.§ 66-152 *et seq.*

24

122.     Upon information and belief, Defendant Morgan used the confidential information and trade secrets in an effort to unlawfully use the information to jumpstart a competitive solar energy construction and distribution businesses in Utah in order to compete unfairly with SunEnergy1 in the solar energy industry, for her own self-gain and on behalf of her family-run companies.  Upon information and belief, Defendant Morgan also transferred to others, including at a minimum, her father and brother-in-law, confidential information and trade secrets.

123.     SunEnergy1 exercised reasonable efforts to maintain the secrecy of its confidential information and trade secrets, by having employees, such as Defendant Morgan, sign employment agreements containing confidentiality and non-disclosure covenants.

124.     Upon information and belief, Defendant Morgan misappropriated SunEnergy1's confidential information and trade secrets before her access to SunEnergy1's trade secrets was terminated.

125.     Defendant Morgan's activities constitute actual and/or threatened misappropriation of SunEnergy1's trade secrets and confidential and proprietary information in violation of North Carolina common and statutory law.

126.     Defendant Morgan's activities are without the consent of SunEnergy1 and have been undertaken willfully and/or maliciously and/or with reckless disregard of SunEnergy1 and its rights.

127.     Based on the activities of Defendant Morgan in the use of SunEnergy1's confidential information and trade secrets, SunEnergy1 has incurred damages in an amount as yet to be determined by a jury.

128.     Upon information and belief, Defendant Morgan has been unjustly enriched, realized economic gain, and received other value from the use of SunEnergy1's trade secrets.

129.     As a consequence of the foregoing, Plaintiff has suffered, and will continue to suffer, harm and loss, some of which is irreparable for which there is no adequate remedy at law.

130.     As a result of Defendant Morgan's actions, SunEnergy1 is entitled to recover punitive damages, as well as attorneys' fees and other related expenses.

## SIXTH CAUSE OF ACTION
### (Violation of NC Gen. Stat. § 14-458)

131.     Plaintiff realleges and incorporates by reference all prior paragraphs in this Complaint and paragraphs in the claims below as though set forth fully herein.

132.     On information and belief, Defendant Morgan knowingly and intentionally accessed SunEnergy1's computers without authorization, and thereby obtained and used valuable information from those computers in violation of N.C. Gen. Stat. § 14-458. Such information included, but was not limited to, SunEnergy1's confidential and proprietary information.

133.     Upon information and belief, Defendant Morgan intentionally accessed a protected computer without authorization and, as a result of such conduct, caused damages and loss, in violation of N.C. Gen. Stat. § 14-458.

134.     Upon information and belief, Defendant Morgan accessed this system for the purpose of commercial advantage and/or private financial gain.

135.     SunEnergy1 suffered damages and loss as a consequence of Defendant Morgan's actions, including, but not limited to, the cost of investigating and responding to the unauthorized access and abuse of its computer networks, conducting damage assessments, the loss of the value of Plaintiff's trade secrets, and the harm to SunEnergy1's business as described above.

136.     Defendant Morgan caused loss to one or more persons during a one-year period aggregating over $5,000 in value.

26

137.     As a consequence of the foregoing, Plaintiff has suffered, and will continue to suffer, harm and loss, some of which is irreparable for which there is no adequate remedy at law.

138.     SunEnergy1 seeks compensatory and other equitable relief under N.C. Gen. Stat. § 14-458.

## SEVENTH CAUSE OF ACTION
### (Unfair and Deceptive Trade Practices)

139.     Plaintiff realleges and incorporates by reference all prior paragraphs in this Complaint and paragraphs in the claims below as though set forth fully herein.

140.     Defendant Morgan's actions have had a real and substantial, adverse impact on SunEnergy1. Defendant Morgan's actions, particularly the misappropriation of SunEnergy1's confidential information and trade secrets, constitutes an unfair and deceptive trade practice under North Carolina law.

141.     The acts of Defendant Morgan as described herein were "acts or practices in or affecting commerce," within the meaning of N.C. Gen. Stat. § 75-1.1.

142.     The acts of Defendant Morgan as described herein constitute unfair or deceptive acts or practices within the meaning of N.C. Gen. Stat. § 75-1.1.

143.     SunEnergy1 has been directly and proximately injured in excess of $25,000.00 as a result of Defendant Morgan's unfair and deceptive trade practices.

144.     As a consequence of the foregoing, Plaintiff has suffered, and will continue to suffer, harm and loss, some of which is irreparable for which there is no adequate remedy at law.

145.     Pursuant to N.C. Gen. Stat. § 75-1.1 *et seq*, SunEnergy1 is entitled to treble damages and attorneys' fees.

## EIGHTH CAUSE OF ACTION
### (Conversion)

146. Plaintiff realleges and incorporates by reference all prior paragraphs in this Complaint and paragraphs in the claims below as though set forth fully herein.

147. Defendant Morgan converted SunEnergy1 information for her own personal use.

148. Defendant Morgan was not authorized to access or download SunEnergy1 information or files.

149. In downloading those files, Defendant Morgan committed a distinct, unauthorized act of dominion or ownership over those files, without SunEnergy1's permission.

150. The information and files were the exclusive personal property of SunEnergy1.

151. Plaintiff has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SunEnergy1 requests that:

152.    The Court issue a Permanent Injunction prohibiting Defendant Morgan from using, disclosing, or otherwise misappropriating SunEnergy1's trade secrets and other confidential information pursuant to the DTSA, N.C. Gen. Stat. § 66-154, N.C. Gen. Stat. § 14-458, and Defendant Morgan's Confidentiality Agreement.

153.    The Court issue an Order requiring Defendant Morgan to return to SunEnergy1 any and all SunEnergy1 property, whether physical or electronic, in her possession, custody, or control, including any property containing SunEnergy1's trade secrets, or any other confidential or proprietary information, and destroy any other documents created by them from any of SunEnergy1 trade secrets;

154.    SunEnergy1 be awarded its actual damages for Defendant Morgan's misappropriation of SunEnergy1 trade secrets;

155.    SunEnergy1 be awarded its actual damages, compensatory damages and exemplary damages under the DTSA;

156.    SunEnergy1 be awarded its damages for Defendant Morgan's breach of contract, conversion, and unfair trade practices;

157.    SunEnergy1 be awarded punitive damages arising out of the willful and malicious misappropriation of the SunEnergy1 trade secrets by Defendant Morgan under the N.C. Gen. Stat. § 66-154(d) and 18 U.S.C.  §  1836 (b)(3)(C);

158.    SunEnergy1 be awarded treble damages for Defendant Morgan's unfair and deceptive trade practices pursuant to N.C. Gen. Stat. § 75-16;

29

159. 140. SunEnergy1 be awarded its reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 66-154(d), 75-16.1, and 14-458, the DTSA, 18 U.S.C. § 2701 *et seq*., and 18 U.S.C. § 1030 and as may otherwise be permitted by law;

160. SunEnergy1 be awarded its costs as may be permitted by law;

161. A trial by jury on all issues so triable; and

162. Any such other and further relief as the Court may order.

Respectfully submitted,

**SUNENERGY1, LLC**

By its attorneys,

 /s/ *Robert L. Lindholm*
Nelson Mullins Riley & Scarborough LLP
Robert L. Lindholm
N.C. Bar No. 52800
robert.lindholm@nelsonmullins.com
David N. Allen
N.C. Bar No. 9095
David.allen@nelsonmullins.com
One Wells Fargo Center
301 South College Street, 23rd Floor
Charlotte, NC 28202
T: 704-417-3000

Mitchell Boyarsky (*pro hac vice motion pending*)
Mitch.boyarsky@nelsonmullins.com
280 Park Ave
15th Floor West
New York, NY 10017
T: 646-428-2600

Robert Sheridan (*pro hac vice motion pending*)
Robert.sheridan@nelsonmullins.com
One Financial Center, Suite 1500
Boston, MA 02210
T: 617-217-4700

30

Bell Davis & Pitt P.A.

Marc E. Gustafson
N.C. Bar No. 34429
mgustafson@belldavispitt.com
227 West Trade Street, Suite 1800
Charlotte, NC 28202-1697
T: 704-227-0400

September 13, 2021